<pre>
 1                    UNITED STATES DISTRICT COURT
 2                    NORTHERN DISTRICT OF OHIO
                          EASTERN DIVISION
 3

 4    UNITED STATES OF AMERICA,

 5            Plaintiff,          Case No. 5:15CR186
                                  Akron, Ohio
 6        vs.                     Tuesday, November 3, 2015
                                  10:05 a.m.
 7    TROY B. SCHUURING,

 8            Defendant.

 9

10             TRANSCRIPT OF SENTENCING HEARING
             BEFORE THE HONORABLE JOHN R. ADAMS
11               UNITED STATES DISTRICT JUDGE

12
      APPEARANCES:
13
      For the Government:  Michael A. Sullivan
14                         Office of the U.S. Attorney - Cleveland
                           Carl B. Stokes U.S. Courthouse
15                         801 Superior Avenue, West, Suite 400
                           Cleveland, Ohio 44113
16                         (216) 622-3600

17    For the Defendant:   Craig T. Weintraub
                           Attorney at Law
18                         55 Public Square, Suite 1600
                           Cleveland, Ohio 44113
19                         (216) 896-9090

20    Court Reporter:      Caroline Mahnke, RMR, CRR
                           Federal Building & U.S. Courthouse
21                         2 South Main Street, Suite 568
                           Akron, Ohio 44308
22                         (330) 252-6021

23

24    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription.
25
</pre>

1           Tuesday, November 3, 2015

2           THE COURT:  For the record, the Court has before

3   it today Case Number 5:15CR186.  The case is United States

4   of America versus Troy B. Schuuring.  We're here today for a

5   continued sentencing hearing.

6           Counsel for the government, are you ready to proceed?

7           MR. SULLIVAN:  Yes, Your Honor.

8           THE COURT:  On behalf of the defendant?

9           MR. WEINTRAUB:  Yes, Your Honor.

10          THE COURT:  Just one moment.

11          When we last adjourned we addressed or were attempting

12  to address certain outstanding objections.  At that time one

13  of the objections related to the number of images, as I

14  recall, and the agent was unavailable to us and he is

15  present now here today.

16          Counsel, by way of review, let's make it clear.  The

17  Court has previously ruled on objections as it relates to

18  the objection to paragraph 32.  I think I previously ruled

19  on that issue and cited certain authority in support of the

20  two-level enhancement at paragraph 32.

21          The objection at paragraph 25, defendant believes the

22  total number of child pornography videos should be 197.  Not

23  228.  That is the objection by the defendant.

24          We do have a response which relates to the FBI

25  investigation report that the defendant possessed two videos

1    bookmarked under the title of Possession of Child

2    Pornography Bondage; 197 videos bookmarked under the title

3    POS, possession -- well, POS CP, a video; and then 29 videos

4    bookmarked under the title POS Toddler CP.

5          The total number of videos according to the report was

6    228.

7          So with regard to that objection, counsel, are you

8    ready to proceed and present your witness today?

9                MR. SULLIVAN:  Yes, Judge.

10         It's my understanding, though -- I had a conversation

11   with Mr. Weintraub.  I'm not sure that will be necessary.

12               MR. WEINTRAUB:  Your Honor, if I may, I had an

13   opportunity to speak to Mr. Sullivan as well as the task

14   force agent this morning.  And it is my error with respect

15   to that objection concerning paragraph 25.

16         I did not include a couple of the outstanding videos.

17   There were two, I believe, for bondage, and there were

18   another 29 that were child porn.

19         So that total number of CP videos is 228.  Not 197.

20   And therefore, I withdraw the objection.

21               THE COURT:  All right.  Thank you.  The objection

22   will be withdrawn.

23         I believe, likewise, that the objection to paragraph

24   33, the Court previously ruled on or addressed that

25   objection as well.

1          And so it's clear, the Court overrules the objection.

2     The two levels for the use of the computer does apply.

3          And then the remaining objection relates to paragraphs

4     43 to 49 -- actual 44 to 50 in the updated report,

5     information related to statements that Mr. Schuuring may

6     have made at the time of his apprehension and also

7     information regarding a polygraph examination that was

8     administered at that time.

9          Do you wish to be heard any further regarding that

10    objection, counsel?

11              MR. WEINTRAUB:  No, Your Honor.  I think that I

12    tried to give as much detail as to the reason for my

13    objection.  My primary concern was -- I tried to understand

14    the report that was provided to me during discovery to see

15    if the comments that were made by Mr. Schuuring were part of

16    the polygraph or it simply was an oral statement that he

17    made prior to or subsequent to the polygraph.

18         Be that as it may, whether or not those statements are

19    true or false, the content in and of itself, I think, as I

20    indicated in my objection, if it remains on the report and

21    is not redacted from the report, information that I

22    have -- and Your Honor, I don't have anything from the BOP

23    that could suggest with 100 percent certainty that it could

24    impact his security level.  However, from some of the

25    information that I provided in the objection, that this

1    could increase his security classification and could

2    potentially limit his opportunity for educational/vocational

3    programming.

4        So that was really the basis, Your Honor.  It

5    wasn't -- ultimately it's not going to, I don't believe,

6    impact the 3553(a) factors to a significant degree.  My

7    primary concern, though, was having it in the report and it

8    impacting the security level that he has.

9        THE COURT:  Are you disputing that your client

10   made these statements?

11       MR. WEINTRAUB:  No.  We -- no, in fact I'm not

12   disputing that he made those statements.  The question that

13   I ultimately had was whether those statements were made

14   during the course of a polygraph, where the examiner

15   indicated in a report that he did not think that Mr.

16   Schuuring was believable.

17       "Believable" is not the term of art for a polygraph.

18   And so -- no, I was just ultimately trying to distinguish

19   whether it was during the course of an interview that they

20   had with him or the polygraph.

21       THE COURT:  Well, the agent's here.  I think

22   perhaps he can answer the questions for us.

23       MR. SULLIVAN:  Judge, the polygraph examiner is

24   in court as well.

25       But this was all audio-recorded.  The whole thing was

1   on audio.  So it was -- I mean, it was not during the test.

2   It was the pre-interview and the post-interview.

3         But Agent Pape is here if the Court or defendant has

4   any questions for him.

5               THE COURT:  Put him on.  Call him.  Let him tell

6   us what the result of the examination was and what he may

7   have learned.  And since there is an objection, there is a

8   challenge, it would be helpful to the Court to at least

9   understand generally what transpired and what the polygraph

10  operator's opinion might be.

11        Sir, if you would raise your right-hand.

12                           PAUL PAPE,

13       of lawful age, a witness called by the Government,

14         being first duly placed under oath, was examined

15                    and testified as follows:

16              THE COURT:  Thank you.

17        Counsel.

18               DIRECT EXAMINATION OF PAUL PAPE

19  BY MR. SULLIVAN:

20  Q.    Please state your name and spell your last name for

21  the record.

22  A.    My name is Paul Pape, P-A-P-E.

23  Q.    And by whom are you employed?

24  A.    I'm employed with the Federal Bureau of Investigation.

25  Q.    In what capacity?

1    A.    I'm a special agent.

2    Q.    And do you have any additional duties?

3    A.    I do.  I'm a polygraph examiner.

4    Q.    All right.  And on April 21, 2015, were you asked to

5    participate in a search warrant interview and polygraph of

6    Troy Schuuring?

7    A.    Yes.

8    Q.    And did you do that?

9    A.    Yes.

10   Q.    Where did you do that?

11   A.    I did that at the Crawford County sheriff's office.

12   Q.    And can you tell us just what transpired?  Did he come

13   to you, or did you -- how did you come in contact with Mr.

14   Schuuring?

15   A.    Mr. Schuuring was brought to the Crawford County

16   sheriff's office where I was waiting.

17   Q.    Okay.  And what kind of room were you in?

18   A.    Standard interview room.

19   Q.    And did you have polygraph equipment with you?

20   A.    I did.

21   Q.    All right.  What does that consist of?

22   A.    That consists of a laptop computer, several different

23   components that comprise a polygraph.

24   Q.    All right.  Now, did you have a conversation with Mr.

25   Schuuring?

1    A.    I did.

2    Q.    Who was present in the room?

3    A.    Myself and the defendant.

4    Q.    Did you inform him of his constitutional rights as far

5    as police questioning?

6    A.    I did.

7    Q.    And how did you do that?

8    A.    I have the Advice of Rights form on my laptop.  I

9    pulled that form up, explained that form to him, and had him

10   read that form to make sure he understands what the form

11   says.

12   Q.    All right.  And did you -- did he appear to understand

13   it?

14   A.    He did.

15   Q.    Did he have any questions about it?

16   A.    No.

17   Q.    All right.  Do you generally ask defendants to sign?

18   A.    I do.

19   Q.    Did you ask him to sign?

20   A.    Yes.

21   Q.    What did he say?

22   A.    He refused to sign.

23   Q.    Okay.  Did he say why?  I mean, what --

24   A.    He was angry at the government for the sting operation

25   he implied that we had conducted on him, so he did not wish

1    to sign any forms.

2    Q.    All right.  But did he agree to talk to you?

3    A.    Yes.

4    Q.    Did he waive his rights?

5    A.    Yes.

6    Q.    All right.  Did you have a conversation with him?

7    A.    I did.

8    Q.    All right.  And can you tell us -- now, also, is there

9    also a consent to take polygraph form?

10   A.    There is.

11   Q.    Did you read that to him at that time?

12   A.    Not at that time.  Later on in the process, I did.

13   Q.    All right.  So tell us, after you read him his

14   constitutional rights and he waived them, tell us about the

15   conversation you had with him?

16   A.    That conversation pertained to why he was there,

17   possession and distribution of child pornography images and

18   videos.

19         In that conversation we talked about how he had those

20   images on his computer, why they were on his computer, how

21   he obtained them.

22   Q.    And do you recall what he told you?

23   A.    Yes.

24   Q.    All right.  Can you tell us?

25   A.    He said that he had the images and videos on his

1    computer.  He said that he is -- called himself a

2    naturalist.  He likes the human body and the child body, and

3    he searches for those videos and those images.

4         He used an Ares peer-to-peer program for a few months

5    prior to us -- prior to me talking to him.  And he used

6    that, amongst other things, to search for child pornography

7    images and videos.

8    Q.   Okay.  And did you have any further conversation with

9    him?

10    A.   Yes.  As I said, he was -- he expressed his anger at

11    the government for conducting the sting operation regarding

12    this child pornography information.

13         He said that in other countries this type of activity

14    was legal, and he considered this government overbearing on

15    this type of activity.

16    Q.   Okay.  And did you talk to him at all about his other

17    sexual history?

18    A.   I did.

19    Q.   And what did you talk about?  What did he tell you

20    about that?

21    A.   We talked about other -- any type of past encounters

22    and contact with children.

23         And he related some situations in the past, I believe

24    when he was in Michigan, and he had a role as a youth leader

25    and he also had a role as looking over young children.

1    Q.    And what did he tell you about those?  What did he say

2    about those incidents?

3    A.    He said he had contact with children like that in

4    certain types of situations.  He didn't come out and tell me

5    that he had sexual physical contact with minors, but he had

6    been placed in the positions of looking after young children

7    and had -- I believe he said he had contact with them in

8    bathing them and changing them and things like that.

9    Q.    Okay.  So at some point did you ask him if he wanted

10   to -- was willing to take a polygraph examination?

11   A.    I did.  He knew that was the reason he was there for.

12   Q.    Okay.  So before conducting the polygraph examination,

13   did you then go over that form with him?

14   A.    I did.

15   Q.    All right.  I'm going to show you what's been --

16              MR. SULLIVAN:  Do you have these?

17              MR. WEINTRAUB:  Yes.

18   BY MR. SULLIVAN:

19   Q.    I'm going to show you what's been marked as

20   Government's Exhibits 2 and then 3.  Just ask you if you

21   recognize those.

22   A.    I do.

23   Q.    What do you recognize those as?

24   A.    Exhibit 2 is the Consent to Interview With Polygraph

25   form.

1        And Exhibit 3 is the Advice of Rights form.

2   Q.    Starting with Exhibit 3, is that the Advice of Rights

3   form that you discussed before that you read to him?

4   A.    Yes.

5   Q.    All right.  And that he refused to sign?

6   A.    Correct.

7   Q.    All right.  The Consent to Interview With Polygraph,

8   how did you notify him of that?  Did you read it?  Did he

9   read it?  How did that happen?

10  A.    It's the same process.  I pulled it up on my polygraph

11  computer and had him read it over as I explained that to him

12  as to what that means.

13        And at the end, I asked him to sign it to, if nothing

14  else, just to say do you understand what that form says.

15        And he again didn't want to sign any forms.

16  Q.    Okay.  But did he agree to take the polygraph

17  examination?

18  A.    He did.

19  Q.    All right.  And did you conduct the polygraph

20  examination?

21  A.    I did.

22  Q.    All right.  Can you tell us about that?

23  A.    After the pre-interview part of what we talk about,

24  then there is what we consider an in-test portion of the

25  polygraph.  That's where we actually conduct the polygraph,

1    attach the components, and then run a polygraph examination.

2    Q.    Okay.  I'm going to show you what's been marked as

3    Government's Exhibit 4 for identification.

4          Can you tell me if you recognize that?

5    A.    This is the polygraph examination report that is put

6    together to hold all the reports for the polygraph exam.

7    Q.    So that's the report you prepared in this case?

8    A.    That is.

9    Q.    All right.  So going back to the exam, when you

10   conduct the exam, can you explain to us, were there certain

11   questions you asked?  Explain to us what happened?

12   A.    For the FBI in a criminal polygraph exam we ask two

13   relevant questions, relevant particular to this issue.  So

14   there are two relevant questions that I've identified on

15   this polygraph examination report that were asked to the

16   defendant.

17   Q.    And what were those questions?

18   A.    Since age 20, have you ever had any physical sexual

19   contact with a child?

20         And since age 20, have you ever engaged in any sexual

21   activities with a child?

22   Q.    All right.  And how did he answer those two questions?

23   A.    He answered both those questions no.

24   Q.    And did you, based on your review of the charts on

25   your polygraph computer, did you have an opinion as to

1    whether or not those answers were truthful?

2    A.    I did.

3    Q.    What was that opinion?

4    A.    They were not truthful.

5    Q.    And did you tell that to Mr. Schuuring?

6    A.    I did.

7    Q.    All right.  And did you have a further conversation

8    with him?

9    A.    I did.

10   Q.    And did he tell you anything additionally?

11   A.    He said he was thinking about his sexual contact 18

12   years and younger, and that's why he failed the test.

13   Q.    Okay.  And was that it?  Or did he say anything else?

14   A.    No.  He said that he was -- when I explained that that

15   wasn't the reason he failed the test, he talked about his

16   activities with young children and how that was stimulating

17   to him.

18        And we had a discussion of what the difference between

19   arousing and stimulating is as far as that type of sexual

20   contact.  And we talked about that definition for awhile.

21   Q.    Okay.  And maybe if you could just give us a better

22   idea.  So what was that, the nature of that conversation

23   about the difference between arousing and stimulating?

24   A.    He said you could be stimulated by a flower, by its

25   beauty.  And that's how he described how he was stimulated

1   by young children, the beauty of the child's body.

2         And he claimed that it wasn't sexual arousal, and he

3   wasn't looking at this stuff for arousal, but he was looking

4   at it for the hunt.  And he wasn't aroused, but he was

5   stimulated when he had contact or was around children.

6   Q.    Okay.  So that was the distinction he was making?

7   A.    That was the distinction he was making, yes.

8   Q.    All right.  Now, at the end of this process, did you

9   prepare a statement for him?

10  A.    I did.

11  Q.    I mean, did you try to summarize what he had said in

12  writing?

13  A.    Yes.  I tried to summarize what we talked about in the

14  pretest and in the post test portion of the interview.

15  Q.    All right.  I'm going to show you what's been marked

16  as Government Exhibit 1 for identification and ask you, do

17  you recognize that?

18  A.    I do.

19  Q.    All right.  And what is that?

20  A.    This is a summary statement that I typed out.

21  Q.    And can you just actually just describe the procedure

22  that you engage in to prepare that statement?

23  A.    Yes.

24        As with this defendant, I tell him that -- we talk

25  about a lot of information.  I want to summarize that so

1   people down the road can see what we talked about.

2          So in this particular way that I do this, I type out

3   the summary as they compose it for me.

4          So in other words, I will type out a sentence and I

5   will ask him, okay, what next.  Okay.

6          So I go down the process of typing as he's discussing

7   and composing it verbally for me.

8          When I'm all through with that process, I have him

9   read that form over.  And we can change anything, add

10  anything, take anything out until the point where he agrees

11  that that's a good summary of what we talked about.

12         And then I have him sign, and I sign, too, in that

13  summary.

14  Q.    Okay.  So did you engage in that process?  Did you

15  seek his input as you were typing every sentence on there?

16  A.    I did.

17  Q.    And at the end, did you ask him to read it?

18  A.    Yes.

19  Q.    And did he?

20  A.    He did.

21  Q.    And did he have any corrections, deletions, additions,

22  anything?

23  A.    He had a correction and an addition.

24  Q.    All right.  And was that reflected on that report?  Is

25  there something crossed out?

1   A.    There is.

2   Q.    Okay.  And that's something that he asked you to cross

3   out?

4   A.    Yes.

5   Q.    And whatever the addition, did you put something else

6   in there?

7   A.    Yes.  The addition is in there as well.

8   Q.    And at the end did you ask him to sign it?

9   A.    I did.

10   Q.    And did he?

11   A.    No.

12   Q.    But did he agree it was accurate?

13   A.    He agreed it was accurate and a good summary, but

14   again, he didn't want to sign anything that I was asking him

15   to sign.

16   Q.    All right.  Thank you.

17         MR. SULLIVAN:  I have nothing further.

18         THE COURT:  All right.  Thank you.

19      Counsel, you may cross-examine.

20                CROSS-EXAMINATION OF PAUL PAPE

21   BY MR. WEINTRAUB:

22   Q.    Sir, you have the report in front of you that you

23   prepared?

24   A.    Yes.

25   Q.    All right.  You would agree with me that Mr. Schuuring

1    indicated to you unequivocally -- and this is your content;

2    these are your words -- "I have not had any sexual contact

3    with children as an adult."

4        He stated that, didn't he?

5    A.   Yes.

6    Q.   Okay.  Great.

7        He also stated that "I am not looking to hurt anyone.

8    I was looking at these things in the privacy of my home."

9        Is that correct?

10   A.   That's correct.

11   Q.   He also indicated to you that he was exposed to

12   pornography at a young age, and he believes it was around

13   five years old.

14       Is that correct?

15   A.   Correct.

16   Q.   All right.  He said that he has always been drawn to

17   pornography images.  He just -- doesn't just like child

18   pornography but will look at all types of pornography.

19       Is that correct?

20   A.   Correct.

21   Q.   All right.  Other than -- by the way, how long were

22   you with Mr. Schuuring this entire time where you

23   interviewed him and did the polygraph?

24   A.   Approximately two to three hours.

25   Q.   All right.  And this was not -- certainly your

1    interview was not conducted in his house while seated on a

2    couch.  Right?

3    A.    Correct.

4    Q.    It wasn't in a comfortable setting that he might be

5    familiar with.  It was at the Crawford County sheriff's

6    office, correct?

7    A.    Correct.

8    Q.    And this was inside of an interrogation room?  Or a

9    witness examination room?

10   A.    Yes.

11   Q.    And how many law enforcement officers were in there?

12   Just you?

13   A.    Just me.

14   Q.    Okay.  Mr. Schuuring, although he refused to sign

15   these forms that you've identified, he still agreed to talk

16   to you; isn't that correct?

17   A.    That's correct.

18   Q.    Okay.

19          MR. WEINTRAUB:  Thank you.  Nothing further.

20          THE COURT:  Anything else?

21          MR. SULLIVAN:  Just one question.

22             REDIRECT EXAMINATION OF PAUL PAPE

23   BY MR. SULLIVAN:

24   Q.    Just, Agent, your entire -- your interview, both pre-

25   and post-polygraph, was audio-recorded; is that right?

```
 1   A.     That's correct.

 2   Q.     All right.  Thank you.

 3              THE COURT:  All right.  Thank you.

 4          Sir, you may step down.

 5          May I see the report just for my own consideration,

 6   please?

 7          All right.  Thank you.

 8          Counsel, anything else you would like the Court to

 9   consider with regard to this objection?

10              MR. WEINTRAUB:  No, Your Honor.  Thank you.

11              THE COURT:  On behalf of the government?

12              MR. SULLIVAN:  Judge, I believe that that

13   information is properly in the PSR, and I think that

14   actually contrary to Mr. Weintraub's concern, I think it's

15   very important for that information to go to BOP because

16   this is the document that even any treatment provider at the

17   BOP will have that will be able to confront the defendant

18   with any type of minimization.  I think it's important for

19   them to know his entire history when treating him in the

20   future.

21          As far as this Court, I think it does go to the

22   3553(a) factors as to the defendant's history and

23   characteristics, and I think it's very important to follow

24   him to the BOP so that it can be used in treatment.

25              THE COURT:  All right.  The objection is
```

1    overruled.  It's clearly pertinent to the Court's

2    consideration of the 18:3553(a) factors and in the category

3    of evidence that obviously will assist me.

4        The mere fact that it might be -- at least the

5    argument that it might negatively affect the defendant's

6    circumstances in the BOP does not govern whether or not it

7    should be in the PSI.

8        And again, the objection is overruled.  It will be

9    helpful to me.  And more likely than not it will be helpful

10   to the BOP in determining what if any type of programs the

11   defendant might need as it relates to these issues.

12       So I will obviously not strike it from the PSI.

13       With regard to any other objections, are there any

14   other objections on behalf of the government that have not

15   been previously raised that we can address at this time

16   before we finalize the computation of the guideline

17   calculation and proceed to the balance of sentencing?

18           MR. SULLIVAN:  No, Judge.  I just would ask that

19   at least certainly -- well, that Government's Exhibits 1

20   through 4 be accepted by the Court as evidence in this

21   hearing.

22       And particularly Government's Exhibit 1, I think, is

23   important for the Court's consideration because it

24   includes -- and I apologize.  I should have asked for this

25   to be included in the PSR, but I think it's important for

1  the Court to consider because it includes the defendant's

2  comment about his degree in computer electronics and his

3  knowledge of how peer-to-peer software works, and he was

4  knowingly using peer-to-peer software.

5        So I would ask that to be accepted by the Court.

6              THE COURT:  It will be.

7        Counsel for the defendant, any other objections,

8  corrections, any arguments you would like me to address

9  before we turn to sentencing generally?

10             MR. WEINTRAUB:  No, Your Honor.  Thank you.

11             THE COURT:  Thank you.

12       I would note for the record I have now seen

13  Government's Exhibit 1, and I will just incorporate by

14  reference the fact that I've seen it.  And it does have a

15  relationship to the objection of the defendant.  The

16  objection -- I'll quote the number here in a moment.

17       The objection, the first paragraph 32, that defendant

18  objects to the two-level enhancement for distribution

19  because it was not included in the first disclosure.

20  Ultimately it was included, and the defendant's had an

21  opportunity to address that.

22       I think Government's Exhibit 1 also explains the

23  defendant's knowledge, the extent of his knowledge of

24  computers and his awareness of the fact that these photos

25  were in fact being shared, accessible to other various

1    users, and therefore the enhancement at paragraph 32 for two

2    levels applies.

3         Additionally, paragraph 33 -- it's paragraph 34 in the

4    updated report.  Government's Exhibit 1 likewise is

5    probative and is important as it relates to that objection

6    which I believe I previously overruled as it relates to

7    peer-to-peer -- use of the peer-to-peer program.

8         So in any event, we will note those two things just in

9    addition to the Court's earlier findings.

10        Having said that, at this point the Court will now

11   turn to and address the advisory guideline calculation that

12   the Court will have to consider.  And the guideline

13   calculation, the recommendation is set forth in the report

14   beginning at page 7.

15        There is a base offense level of 22 for this offense.

16        There is a two-level enhancement because the materials

17   involved a prepubescent minor or minor who had not attained

18   the age of 12 years.  There are pictures, there are images

19   reflecting pictures of children who I believe are eight and

20   nine, as outlined in the report under the paragraphs, the

21   various paragraphs of offense conduct.

22        Specific offense characteristic.  If the offense

23   involves distribution other than distribution described in A

24   through E, increase by two levels.  And as I touched on

25   earlier, the defendant did use a peer-to-peer program that

1     allowed users to download child pornography that he

2     possessed.  Therefore, United States Sentencing Guideline

3     2G2.2(b)(3)(F) does apply.

4          Again, based upon Government's Exhibit 1 and the

5     authority that I believe I've earlier cited, Sixth Circuit

6     case, it appears that that enhancement is proper as we

7     discussed at the last hearing.

8          With regard to paragraph 33, specific offense

9     characteristics, if the defendant -- if the offense, excuse

10    me, involved material that portrays sadistic or masochistic

11    conduct or other depictions of violence, increase by four

12    levels.  And there is a video that's reflected at paragraph

13    33, an adult male engaged in oral-to-genital intercourse

14    with a prepubescent male and his hand and feet were bound

15    with a rope, gives rise to that specific offense

16    characteristic.

17         And the use of the computer which we touched on

18    earlier, which is two levels.

19         And then there is a five-level increase based upon 600

20    or more images.  There are 461 images and 228 videos which

21    equates to a total of over 17,000 images.  And the

22    five-level increase applies.

23         The adjusted offense level is a 37.

24         A downward adjustment of two levels is recommended for

25    acceptance of responsibility.

1        Does the government seek the additional one level?

2               MR. SULLIVAN:  Yes, Judge.

3               THE COURT:  Thank you.

4        The additional one level will apply.

5        The total offense level is a 34.

6        The defendant's criminal history is outlined in page 9

7   and 10, paragraph 52.  He has an offense that does not

8   score, the aggravated assault which is dated, a 1997

9   offense.

10       And then there is a 2014 offense for domestic

11  violence, September 30 of 2014.  The sentence was imposed.

12  One point is scored for that offense.  The defendant was

13  placed on -- served three days, 27 days were suspended, and

14  36 months probation.

15       And that probation triggered the additional two points

16  under paragraph 55 and thus creates a criminal history

17  category of II.

18       Other than any of the objections that you have

19  previously raised regarding the guideline calculation,

20  counsel, do you have any other objections to the Court's

21  guideline calculation?

22               MR. WEINTRAUB:  No, Your Honor.

23               THE COURT:  Thank you.

24       On behalf of the government?

25               MR. SULLIVAN:  No, Judge.

1           THE COURT:  All right.  Having said that,

2      counsel, the guideline calculation here at offense level 34,

3      criminal history category II, the guideline provisions,

4      custody is the mandatory minimum of five years up to 20, is

5      the statutory provisions.  168 months to 210 months is the

6      guideline provision.  And then supervised release of five

7      years to life would be the possible.

8           And the other remaining sentencing issues, other

9      collateral or other consequences are really not important

10     given the defendant's economic circumstance.

11          So having said that, what argument, counsel, do you

12     wish to make?

13          I would note that I've read the defendant's sentencing

14     memorandum, the government's, and I've also noticed a

15     supplemental sentencing memorandum that I've also read.

16          With regard to the type of sentence the Court should

17     impose?

18          MR. WEINTRAUB:  Thank you, Your Honor.

19          I'm going to -- in my argument I want to draw from

20     some of the points that I made in my sentencing memorandum.

21     I think first and foremost you are deciding the future of a

22     man who is only 39 years old.  He has a minimal criminal

23     history, as you noted, a conviction from 1997 and then a

24     recent domestic situation which placed him on probation.

25     Other than that, there isn't anything else.

1    He has been gainfully employed for the last 15 years

2    until his arrest.  He has never been married; has no

3    children.  He did obtain his GED.  He also attended ITT

4    Technical Institute for computer programming and withdrew

5    from that so he can assist his family with some of the

6    monetary issues that they were having.

7        And the house that he lived in at the time of his

8    arrest he shared with some of his family members.

9        I would point out for the Court, as the Court is aware

10   of the 3553(a) factors, one of the important components is

11   the defendant's health.  And one of those issues that I need

12   to address is that he had three lung surgeries immediately

13   prior to his arrest.

14       He had a blood clot in his lung.  He had complications

15   from that surgery.  And then ultimately it required

16   additional surgery.  And he's still experiencing problems

17   with that.

18       Now, one of the other factors that I think is

19   important throughout this case, which was noteworthy to me,

20   was that Mr. Schuuring indicated that when he was about five

21   years old, which you heard in the testimony from the agent,

22   that that's when he was first exposed to pornography.

23       Now, that was 34 years ago.  And as you read in the

24   report, Mr. Schuuring was adopted.  He had, from all

25   appearances, a relatively healthy family household that he

1     resided in.  They were church-going people.  He ultimately

2     became involved in the church.

3          However, there has been some deep-seeded psychological

4     issues as a result of the adoption.

5          Now, look, the next person can come into this

6     courtroom and say, "I was adopted and it didn't cause any

7     problems."  For him, it has.

8          Now, it's not an excuse for his conduct.  It's just

9     simply that, unfortunately for him, he has these unresolved

10    psychological issues that he never fully addressed.

11         And I bring that up because it's clear from the report

12    as well that he suffers with ADHD and cyclothymia which is a

13    form of bipolar disorder.

14         So he suffered from depression throughout his life,

15    tried to handle it on his own accord, and then as you can

16    see from the report as well, he appears to be an alcoholic.

17    And when he would go through his bouts of depression, he

18    would engage in drinking.

19         There were periods of his life where he maintained

20    sobriety for an extended period of time.  And then most

21    recently, he became involved in drinking again.

22         It was during that time, according to Mr. Schuuring,

23    that that's when his brain started to go down the dark road

24    of pornography.

25         And he's in his house, uses the Ares program, and does

1     searches, pulls up adult pornography and child pornography.

2           Now, it's clear, Your Honor, that according to the

3     records that were provided to you, he was familiar with the

4     term PTHC which I'm sure this Court is familiar with as

5     well.  And that pulled up a wide variety of material.

6           Now, last night in preparation for this hearing, I

7     went through the stack of -- it was a printout of all of the

8     CP that was on his computer.  And I was curious about, as

9     you probably have seen, there is a creation date when they

10    print out what the particular film is.  There is a name of a

11    file.  There is a creation date, a modification date, and an

12    access date.

13          Now, from what I saw, it appears, as Mr. Schuuring

14    indicated, that he was batch downloading.  You're probably

15    familiar with that as well.  And anybody that uses these

16    types of software -- these dangerous software programs, when

17    they're looking for something, for example PTHC, they will

18    do batch downloading, highlight an entire field without

19    actually looking at the content.  That brings it into your

20    computer.

21          Now, I found that for Mr. Schuuring, for example, it

22    appears that there were three dates of significance for the

23    majority of this material.  It was in February of 2014.  And

24    then I found something for September of 2013.  And that's

25    where it appears that the majority of this content came

1    from.

2           The issue, of course, too, Judge, is did he view it?

3    Did he view all of these materials?  He knows he has it on

4    his computer.  The question is, did he view it?  And did he

5    share it with anybody?

6           We know that the Ares program is an open accessible

7    software program.  So anybody could access his computer and

8    do the same thing that he did.

9           So the volume of materials, although it is important

10   for the Court's consideration under 3553(a) factors, on the

11   nature and history and circumstances of the offense, I think

12   that ultimately we're looking at someone on particular dates

13   that I narrowed down who is mired in this depression and

14   ultimately searched for this stuff.  And it was for his own

15   pleasure.

16          So whatever he did, he didn't trade it online.  Other

17   than in the Ares program, Your Honor, he never traded it.

18   He was never in chat rooms.  Never received any money.

19   Never had anything to do with the production of these videos

20   or images.

21          THE COURT:  He knew how Ares worked, though, did

22   he not?

23          MR. WEINTRAUB:  I am not disputing that.  There

24   is no doubt that he was aware how Ares worked and there is

25   no doubt that other people, like-minded people, could search

1     for that and gain access to it on his computer as well.

2     Thus, the distribution charge.  Thus, these enhancements.

3                THE COURT:  He wasn't just looking, was he?

4                MR. WEINTRAUB:  No, Your Honor.  I mean, it's --

5                THE COURT:  He was moving files from his shared

6     folder to his pictures folder.  He had not only child

7     pornography, but he had other what has been called or

8     characterized as erotica involving children.

9                MR. WEINTRAUB:  That's right.

10                THE COURT:  You're not suggesting to me he didn't

11    have a direct interest in child pornography?

12                MR. WEINTRAUB:  No, Your Honor.  I'm not doing

13    that at all.  I mean, it's abundantly clear that he has this

14    deep-rooted -- it's an illness, of course.

15                THE COURT:  He calls it in Government Exhibit 1,

16    he says, "It's a hunt when I search for and find child

17    pornography.  I probably have thousands of child pornography

18    pictures on my computer currently."

19                MR. WEINTRAUB:  Yeah, and I mean -- look, Judge,

20    I'm not going to try to, you know, use semantics to define

21    what the term "hunt" is.

22          You will use your own experience based on what you're

23    reading, and you'll draw your decision as to whether or not

24    he presents a danger to the community in the future.

25          I mean, ultimately that's what your concern is for

1    someone who, quote, "is on a hunt," for this type of

2    material.

3        I'm only merely suggesting to the Court that there is

4    a profound illness for somebody that is involved in this.

5    And I think my sentencing memorandum even reflects that

6    morally and legally this is offensive conduct.

7        And Mr. Schuuring is certainly aware of the

8    re-victimization aspect of his conduct; however, the

9    additional factors that I pointed out regarding his physical

10   health issues, his mental health issues, his family

11   situation, are important for the Court's consideration.

12       Now, one of the other factors that the Court needs to

13   consider under 3553(a) is the need to avoid unwarranted

14   sentence disparities among defendants with similar records

15   and crimes.

16       Now, look, there are no specific statistics that are

17   out there as to what other District Court judges in the

18   Northern District are doing.  It's certainly up to you to

19   decide.  It's your discretion as to what the appropriate

20   sentence should be.

21       Now, I want to point out to you, Your Honor, that

22   recently there was a defendant in your courtroom -- and I

23   know each and every person is different.  I say that in

24   advance of this individual's name.  But I read his case.

25   And I saw that he has a prior conviction.  His name is

1       William Marino.

2              William Marino was before this Court on October 20,

3       2015 and was sentenced for the same sort of crime.  And he

4       had a prior, a prior for which he was on probation.  And

5       that individual, Mr. Marino, while he's on probation, was

6       going to a university in Akron and downloading child porn

7       and placing it into a drop box.

8              He then had on his Facebook page where he was actively

9       searching for 12-year-olds or older to participate in sex

10      with him.  And that individual -- and again, Your Honor, it

11      could be an apples and oranges situation, but I'm looking at

12      the crime itself and an individual who had a prior.

13             THE COURT:  Dramatically different case, sir.

14      The facts of that matter are dramatically different.  Not

15      even a close question as compared and contrasted with Mr.

16      Schuuring to Mr. Marino.  Not close.

17             And if you would like me to tell you why, I will.  But

18      it is not a comparable case.

19             MR. WEINTRAUB:  Your Honor --

20             THE COURT:  There is not any disparities between

21      Mr. Schuuring and Mr. Marino.  I recognize you want to call

22      it to my attention.  I remember the case intimately.

23      Different case.  Different facts.  Different defendant.

24      Completely uncomparable, at least in my view based upon the

25      history and the characteristics of Mr. Marino, his mental

1    and medical conditions, and other factors and circumstances

2    as outlined in that case.

3         So you're free to argue all you want about that case,

4    but it has no bearing whatsoever.  At least in my view it

5    does not compare to Mr. Schuuring.

6              MR. WEINTRAUB:  Fair enough, Your Honor.  I

7    certainly wanted to draw your attention to that case.  And I

8    wouldn't be privy to the presentence report and understand

9    the contents of that.  That's why I provided you with an

10   admonition on my part where I'm indicating to you that I

11   don't know all the facts of that case.  I'm simply looking

12   at what that man pled to and the prior.

13             THE COURT:  And that's the problem.

14             MR. WEINTRAUB:  And that's it.

15             THE COURT:  And that's the problem when you

16   simply say, on paper, well, this is what he pled to and this

17   is the sentence he received and that you cannot know

18   and -- or maybe you can.  I don't know.  You don't know all

19   the 18:3553(a) factors as they apply to that defendant, what

20   the circumstances were, and why and how I gave him the 70

21   months.

22             MR. WEINTRAUB:  You're a hundred percent right.

23   I certainly can't argue with you over that.  And it's not a

24   point of contention.

25             It's simply that we're at a situation in defending

1    these types of cases --

2              THE COURT:  Are you going to turn to the other

3    case of -- there were two on that day.  There was another

4    defendant that day who was in his 60's.  His name escapes me

5    at the moment.

6         Mr. Sullivan, do you remember?

7              MR. SULLIVAN:  Vogus, Donald Vogus.

8              THE COURT:  And what was his sentence?

9              MR. SULLIVAN:  121 months, I believe.

10             THE COURT:  I believe 121 months, and that was

11   perhaps at the low end of the guidelines.

12        So when we start talking about these cases, these are

13   more individualized than any other cases I see.

14        So, if you want to go 70 months, talk about the 121

15   months, we can talk about I think recently a 150 or 60 month

16   sentence I saw from Judge Boyko recently.  I think that was

17   the gentleman who was in the Coast Guard, if memory serves

18   correctly.

19        What did he get, 151 months?

20             MR. SULLIVAN:  That wasn't my case.  I believe it

21   was 180 actually.

22             THE COURT:  180 months.  So --

23             MR. WEINTRAUB:  And Your Honor, I certainly

24   understand that.

25             THE COURT:  So these individualized cases, these

1     are not, you know -- drawing comparisons is very difficult

2     to do.

3          MR. WEINTRAUB:  Your Honor, and I understand

4     that.  Look, I've had a lot of cases that I've defended in

5     front of Judge Polster where he believes that the mandatory

6     minimum is a strict enough sentence.  And so he'll impose 60

7     months.  Each judge is unique.  They will decide the -- they

8     will decide the 3553(a) factors on their own.

9          THE COURT:  Well, I'm not going to talk about

10     Judge Polster.  But I am going to comment.  There

11     is -- perhaps you can take a look at *U.S. versus Bristline*

12     out of the Sixth Circuit.

13      With all due respect, and having had many of these

14     cases and the conferences and seminars, there

15     is -- tragically, there is a large number of jurists who

16     don't understand the serious nature of what we're talking

17     about.  They minimize the harm to the victims.  They don't

18     comprehend the dangers these offenders pose.

19      They, candidly, just quite frankly are misguided in

20     their view of the nature of this kind of offense.  Perhaps

21     if they would take the time to look at the images, look at

22     the pictures, hear from victims who have been victimized,

23     things of that nature, perhaps they would have a better

24     understanding.

25      We have philosophical differences around the country.

1    But I'm sorry, I don't think that these cases are being

2    taken seriously enough.  And if you use the sentencing

3    commission's guidelines or their recommendations, you can

4    use those, you can come in many ways to almost the same

5    result.

6            So I'm -- candidly, what other judges are doing,

7    they're doing.  But philosophically these are serious cases

8    and they need to be treated that way.

9            And far too often -- I'll shut up and let you finish.

10   Far too often the focus is, oh, it's all about the defendant

11   and we tend to overlook the victim.  We just completely

12   forget.  And a lot of jurists do that.  Just forget about

13   the faceless, nameless victims, the eight and nine year olds

14   in these pictures, and think, oh, well, it's all about the

15   defendant.  Well, sorry.  The victim needs to be considered

16   here, these victims.

17           And perhaps Mr. Schuuring, as his comments made to the

18   agents exhibits to me, at least according to the statements

19   that he made, complete lack of understanding of what this is

20   doing to these victims.  This is just child erotica.  This

21   is okay in other societies.  That creates issues for me.

22           Go ahead.  Finish your argument.  We will move forward

23   here.

24                   MR. WEINTRAUB:  Thank you, Your Honor.

25           It's understood.  And clearly you can see -- excuse

1    me.  You can see in my sentencing memorandum that I did draw
2    your attention to the sentencing commission report which I
3    think most of us are doing as defense attorneys in trying to
4    emphasize the overcriminalization that we perceive it to be
5    on the guidelines approach to this as opposed to the
6    statutory approach.
7            THE COURT:  What did the commission suggest that
8    we should consider for nonproduction offenses?
9            MR. WEINTRAUB:  Well, are you talking about a
10   definitive number from them as to what range a sentence
11   should be in?
12           THE COURT:  No.  They've set forth, since you
13   call it to my attention -- I keep a copy right here because
14   it's important -- the commission's recommendations for
15   nonproduction guidelines.
16       They made some very specific recommendations of the
17   kinds of things we should consider in imposing sentences in
18   2G2.2 cases.  What do you think --
19           MR. WEINTRAUB:  Well, I would imagine that some
20   of the items that you've already talked about and addressed
21   with me, specifically that a Court should consider the
22   victimization of the individuals that are depicted in those
23   materials.
24       And I would also imagine that they would be talking
25   about the 3553(a) factors which is part of the focus of a

1    sentence as to what are the circumstances of the defendant.

2           And I do understand, Your Honor, about the

3    victimization of the people that are depicted in these

4    videos.

5           Look, as a defense attorney, I have to go out and

6    watch it.  And it's difficult to see.

7           But ultimately Mr. Schuuring's future rests in your

8    hands.  And so the consideration, Your Honor, is where does

9    he fall within the 60-month mandatory minimum versus the 168

10   to 210 guideline, the advisory guideline recommendation?

11          THE COURT:  It's not 210, I don't believe.

12   That's the maximum.

13          MR. WEINTRAUB:  168 minimum on the guidelines, am

14   I correct?

15          THE COURT:  That's right.  But he's not --

16          MR. WEINTRAUB:  So where does he fall within that

17   range?  I mean, that is an enormous range for somebody that

18   has somewhat of a future and could get some of these issues

19   addressed while he's incarcerated.

20          Look, it's a matter of whether or not you are in a

21   position to simply have him locked up for really what could

22   be the rest of his productive life?  And it's based on his

23   conduct.  It's your feelings about this case and this

24   particular individual.

25          Should he be locked up for the next 15 years?  Or is

1    five years, ten years, somewhere in between an appropriate

2    range where it is sufficient but not greater than necessary?

3    And that really is the issue here.

4         And so ultimately with his history that he presents to

5    you in the presentence report, I ask that you vary from the

6    guidelines and give him a sentence that is sufficient but

7    not greater than necessary.

8         I'm not suggesting to the Court that the 60-month

9    sentence is appropriate based on the information that the

10   Court has received.  But I'm asking the Court to consider

11   something that is reasonable under the circumstances.

12        The final thing that I would like to address, Your

13   Honor, is there is no restitution request.  He is indigent.

14   I would ask the Court not to impose a fine and that the

15   Court recommend to the Bureau of Prisons Elkton.

16        Thank you.

17             THE COURT:  Thank you, counsel.

18        Mr. Schuuring, what if any statement do you wish to

19   make on your own behalf?

20        You can remain seated, sir, since you're in custody.

21   And just make sure you use the microphone so you can be

22   better heard.

23             THE DEFENDANT:  Your Honor, I am very ashamed of

24   my conduct and my addiction in pornography.  I never thought

25   I would see myself here.

1        I'm just -- I'm ashamed of what I've done over the

2  years.  I'm ashamed of having pornography of all types.  Not

3  just children, but all types.  It's -- I shouldn't have it.

4  Nobody should have it.

5        I humiliated my family, my friends, myself.  I

6  just -- I ask that I can get some help for my alcoholism and

7  especially counseling for the pornography.

8        THE COURT:  All right, sir.  Thank you.

9        What's the government's position with regard to this

10  matter, please?

11        MR. SULLIVAN:  Thank you, Judge.

12        First, Judge, I would like to -- I have a couple

13  things I would like to take issue with, with the sentencing

14  memorandum that was submitted in this case.  I would like to

15  start with that.

16        On page 2, Mr. Weintraub make the comment, "There is

17  no evidence that anybody accessed his computer and

18  downloaded child pornography that was on the Ares software."

19  That's patently untrue.  Clearly the undercover agent did.

20  Otherwise they wouldn't have gotten the search warrant.  So

21  there is evidence that someone accessed his computer and

22  downloaded files.

23        And then, perhaps more troubling, on page 8 where he

24  said, "Something is clearly wrong when a first offender who

25  does not produce or share but only views can be subjected to

1    an offense level of 32."

2         That's just not the sentence that's applicable to this

3    case.

4         This is not a defendant who only viewed.  This is a

5    defendant who knowingly used peer-to-peer software.  This is

6    a defendant who had a degree in computer electronics, who

7    knew how peer-to-peer worked, who said that he knew that

8    people could access the files in his shared folder, who said

9    that he would move files out of his shared folder into his

10   picture folder, but clearly left them in his shared folder.

11        Mr. Weintraub points out that the two big dates of

12   download were September of 2013 and February of 2014.  But

13   the undercover agent downloaded the images from Mr.

14   Schuuring's computer in February of 2015.

15        So clearly if those are the only days he was

16   downloading, he left them in his shared folder for over a

17   year for other people to get, for other people to download

18   to share with others.

19        So he had several years he was engaging in this

20   activity.

21        And although Mr. Weintraub now says he is not asking

22   for five years, he did in his sentencing memorandum.  And we

23   would also indicate that that was -- I take issue with that.

24   I think that's clearly inappropriate in this case.

25        A few other items.

1       Mr. Weintraub points out that, as in the statement in
2   Government's Exhibit 1, that the defendant was familiar with
3   the term PTHC.  And it says on here he found the information
4   on Wikipedia.
5       Well, I don't think it should be lost what PTHC stands
6   for.  It's preteen hard core.  So that's what he was
7   searching for.  Preteen hard core.
8       I think that is significant, that he was searching for
9   it, that he knew what it meant, and that he actually was
10  using that search term.
11      Mr. Weintraub says that, oh, Mr. Schuuring was aware
12  of the harm he caused to the kids.  I don't think he was.
13      So I read the acceptance of responsibility statement
14  in the PSR.  Well, first of all, let's start with the point
15  Your Honor made.  The comments he made to Agent Pape that he
16  was kind of offended at this sting because it's legal in
17  other countries, that clearly shows a lack of understanding.
18      In his acceptance of responsibility, he doesn't really
19  say anything about being aware of the harm he's causing.  He
20  says, again, contrary to the evidence, "I never traded or
21  intentionally shared."  We know he did.
22      But also, this humiliation for his conduct which is
23  kind of the theme he repeated just today to Your Honor.  I
24  listened carefully to see if maybe he had some kind of -- he
25  finally had a realization of the harm.  But he didn't.

1        "I'm ashamed of my addiction to pornography."  Didn't

2    even distinguish images of adults and children.  And maybe

3    the sad part is, if anything, it's not a term that should be

4    shared between adult and child pornography because it leads

5    to minimization.  It's not -- it is two entirely different

6    things.

7        So for him to lump them together and say he is ashamed

8    of his addition to pornography, he is humiliated because he

9    humiliated his family, friends, and himself.  He didn't talk

10   anything about the children.  He didn't talk about the

11   children who were bound and raped in the images and videos

12   that he downloaded, that he shared, that he kept, that he

13   viewed.  He didn't talk about them.

14       He didn't talk about the life they have to live

15   knowing that the darkest moment of their life was captured

16   on a picture on a video and is being shared and being traded

17   and giving sexual gratification to people such as him, the

18   life they have to live with that burden.  He didn't talk

19   about that.

20       He has no realization of the harm he caused.  He has

21   no realization of the true -- truly the seriousness of the

22   offense for which he has been convicted.

23       So looking at the 3553 factors, Judge, you're familiar

24   with the nature and circumstance of the offense, obviously,

25   and the history and characteristics of the defendant, which

1    I think are important, including those items contained in

2    the paragraphs 43 through 49.  I think that's important.  It

3    goes to his history and characteristics.

4         And the seriousness of the offense, again, it's an

5    extremely serious offense which causes real and palpable

6    harm to the hundreds of thousands of children depicted in

7    the videos that he downloaded and made available to others.

8         Also, just as an aside, and not that I'm here to

9    defend Judge Polster, but just as an aside, I've never seen

10   Judge Polster give the mandatory minimum.  I had a

11   sentencing there last week and he gave the guy 121 months.

12   But that's neither here nor there.

13        THE COURT:  Well, suffice it to say, judges

14   are -- shall we say there is some inherent disparities by

15   their different philosophical views on these cases.

16        So whether Judge Polster imposed 60 months or not, I

17   know there are others in the district who seem to think that

18   well below guideline sentences are appropriate.  And

19   candidly, I disagree.

20        MR. SULLIVAN:  And Judge --

21        THE COURT:  In most circumstances.

22        MR. SULLIVAN:  Right.  And again, I'm not the

23   only one who prosecutes these cases.  So I'm just indicating

24   my experience.

25        THE COURT:  We don't need to debate it.  Again, I

1   think it's well-accepted that there has been different views

2   by different judges and different sentences imposed.

3        I wouldn't be surprised if -- again, the individual

4   nature of the defendant is what drives these cases

5   oftentimes.

6        So I wouldn't be surprised if there is a mandatory

7   minimum somewhere out there.  I've done it myself, I'm sure,

8   in cases, depending on the various factors.

9        So I appreciate your argument.  And let's

10  address -- are you concluded?  Do you wish to add something

11  else?

12            MR. SULLIVAN:  Judge, I think that the guidelines

13  in this case arrived at a range that is sufficient but not

14  greater than necessary and ask you to impose such a

15  sentence.

16        Thank you.

17            THE COURT:  All right.  Thank you.

18        For the record, the Court would note I've carefully

19  considered the matter as I do in every case, criminal case,

20  but particularly in these cases given the statutory

21  penalties as well as the advisory guidelines and all the

22  various circumstances that give rise to these prosecutions.

23        We begin with the nature and circumstance of the

24  offense.  They are that on February 24, 2015, an agent from

25  the Federal Bureau of Investigation using an Internet

1    connected computer located in Stark County, Ohio launched a

2    peer-to-peer program.  And the peer-to-peer program

3    identified a person who was logged into the peer-to-peer

4    network as a potential download candidate for 37 files of

5    investigative interest.

6         The files of interest were identified as child

7    pornography and as being on the subject's computer either

8    currently or in the recent past.

9         And then on February 24 and 25 of this year, the files

10    were downloaded from the defendant.  That was consistent

11    with child pornography.

12         On April 21, 2015, a federal search warrant was

13    executed on the defendant's home in Galion, Ohio.

14         Upon contact with the occupants of that location, the

15    defendant admitted that he had used his computer to search

16    for and download child pornography.

17         The defendant possessed a total of 461 child

18    pornography images and 220 child pornography videos and some

19    of the images and videos included prepubescent minors,

20    depictions of violence toward the victims, and the details

21    of the offense are outlined in paragraphs 5 through 25, and

22    outline the -- characterize the nature of the images that

23    were obtained.

24         In terms of the history and the characteristics of the

25    defendant, he's 39 years old.  He has no juvenile

1    adjudications.  He has two adult convictions.

2         There is some history of violence.  The two

3    convictions, one for aggravated assault and the domestic

4    threats.  The aggravated assault is somewhat dated, and that

5    goes back to 1997.  It was a fairly serious incident, but it

6    is, again, many years ago and did not score.

7         The domestic threat is more recent and is of more

8    concern.

9         The defendant did not report any abuse as a child.  We

10   note that he was adopted and that, of course, is -- has been

11   used to -- certainly it's been suggested by counsel for the

12   defendant as in some way related to the defendant's mental

13   health issues.

14        The defendant has had three lung surgeries in 2015 to

15   remove a blood clot and repair a collapsed lung.  He is

16   still apparently in pain from the surgeries, according to

17   him.

18        The defendant reported experiencing mood swings and

19   depression his entire life, and he has reported alcohol use

20   and the claim that in some respects the alcohol use was a

21   contributing factor to the activity here.

22        In terms of the disparities, there will be no

23   disparities between this defendant and others with similar

24   records and conduct.  And those issues are always difficult

25   because these defendants come to us with different

1    backgrounds, histories, a different age.

2        A defendant who is 67, as the one last week,

3    might -- 121 months might be an extraordinarily lengthy

4    sentence for someone 67 years old or anyone else.  And then

5    others with the kind of issues Mr. Marino suffered from,

6    Marfan syndrome and other types of serious debilitating

7    physical ailments, mitigate a sentence at the low end.

8        So there are sentencing disparities in these cases and

9    they are rife with them, unfortunately, because some judges,

10   I think in my own view, adopt a policy that perhaps

11   overlooks the serious nature of these offenses.

12       In terms of the need for the sentence imposed, just

13   punishment, adequate deterrence, protect the public, reflect

14   the seriousness of the offense, improve the offender's

15   conduct and condition, the issues here are difficult.  The

16   defendant makes poor choices when under the influence of

17   alcohol.  His criminal history is not lengthy, but the most

18   important issue here, need for the sentence imposed, is to

19   afford adequate deterrence, protect the public, obviously

20   improve the offender's conduct and condition.

21       The other two are likewise important.  The seriousness

22   of the offense oftentimes is overlooked.  And it's

23   overlooked quite frequently by, at least in my view, many.

24   Make no mistake, these are serious offenses, and the

25   victimization of these young children is deplorable.  It is

1    not child pornography.  It is child rape.  And that's what

2    the issue is here.

3         Counsel for the defendant has also argued and

4    discussed with me the federal child pornography report that

5    was -- report to Congress dated December 2002.  I have a

6    copy.  I do review it.  I do consider it.

7         And in some ways in addition to the 18:3553(a)

8    factors, the commission's recommendations can be considered

9    by the Court.  They are not part and parcel of the

10   guidelines.  But I think they are suggestions that the Court

11   can use in an overall consideration.

12        The commission, according to its report, believes that

13   the following three categories of offender behavior

14   encompass the primary factors that should be considered in

15   imposing sentences in nonproduction cases.

16        Number one, the content of the offender's child

17   pornography collection, the nature of the offender's

18   collecting behavior in terms of volume, the types of sexual

19   conduct depicted in the images, the ages of the victims

20   depicted, and the extent to which the offender has

21   organized, maintained, and protected his collection over

22   time, including through the use of sophisticated technology.

23        If you apply that here, obviously the nature of

24   the -- excuse me, the content of the collection is outlined

25   in the report.  I need not go through it all in great

1    detail.

2         The children -- and these are children ages eight and

3    nine.  There is bondage.  The defendant makes no mistake

4    that he's searching for preteen hard core images.

5         So it is serious.

6         The types of sexual conduct is outlined and depicted

7    in the images.  I won't describe further for the record.

8    It's outlined in the report.

9         It's gravely concerning to the Court, the ages, eight

10   and nine, as I've touched on, the fact the defendant has

11   had, whether -- again, it's hard to characterize given the

12   substantial nature of many offenders' collections, but in

13   this instance he does have a very large collection of not

14   only images but of over 200 videos which obviously give rise

15   to great concern.

16        The defendant is sophisticated through his use of the

17   technology.  He has skill, training, in the use of the

18   computer.

19        In terms of the degree of the offender's engagement

20   with other offenders, in particular the Internet community

21   devoted to child pornography and sexual exploitation, we

22   don't have any direct evidence of that.  But his statements

23   about child erotica and the fact that this is not something

24   that's prohibited in other cultures exhibits to me, at least

25   generally, that he does not understand the serious nature of

1     this offense and that his reference to other cultures and

2     their -- the lack of either enforcement or the fact it's

3     accepted touches upon, at least in some respects, that

4     aspect of things.

5          The third recommendation with regard to whether an

6     offender has a history of engaging in sexually abusive

7     exploitive or predatory conduct, in addition to his child

8     pornography offense, I can't gauge and judge whether or not

9     the defendant has had any sexual contact with children.

10         There is some evidence of that, as outlined by his

11    interview with the polygraph examiner.  I'm not going to

12    decide that issue.  It's not going to be an overriding

13    factor.  But there is sufficient evidence to give cause or

14    concern that there may have been in the past or certainly

15    based on his statements certainly the desire that would

16    place him as a risk of harm to children in the community.

17         Individuals do not typically -- I think studies would

18    indicate, there is arguments about whether individuals who

19    view this type of conduct are a risk to children in the

20    community.  I'm of the view that generally they are.  They

21    wouldn't be looking, they wouldn't be collecting, they

22    wouldn't be interested in that activity.  They wouldn't be

23    obtaining sexual gratification from same if they weren't

24    interested in potentially having some sort of sexual contact

25    with children.

1         And I think that is generally my view based upon my

2    years of experience with these offenders.

3         With regard to this particular defendant and his

4    background and history, I've already touched on those

5    issues.  Government's Exhibits 1 through 4 outline in nanny

6    ways some of the reasons for the Court's concern.

7         I acknowledge the defendant's medical problems.  I

8    acknowledge that he must have some psychological issues by

9    virtue of his addiction to child pornography as we call it.

10    Adult pornography is a whole different -- a whole different

11    matter.  But his interest in these images, hard core porn

12    involving children, is deeply troubling.

13         Whether or not it's triggered by his depression, his

14    drinking, whether or not in some way, shape, or form he has

15    psychological issues related to his adoption, all that means

16    is that he is in need of treatment, and that will add to the

17    conditions of supervised release and also relate to the

18    Court's sentence in the matter.

19         So I acknowledge those arguments.  I've considered

20    them.  And I've reviewed them.

21         I am of the view, while I will not depart -- and I've

22    never given notice of any departure here -- I am of the view

23    that perhaps a variance based on the defendant's criminal

24    history, I'm not certain that a criminal history category II

25    is warranted by virtue of his limited prior record, and so

1    therefore I will use a criminal history category I at

2    offense level 34 and decide a sentence in the matter.

3           Offense level 34, criminal history category I at the

4    low end of the guidelines is 151 months.  At the high end it

5    is 188 months.

6           So for those reasons, I will do the following:

7           Pursuant to the Sentencing Reform Act of 1984 and 18

8    United States Code 3553(a), it will be the judgment of the

9    Court that the defendant, Troy Schuuring, is committed to

10   the custody of the Bureau of Prisons for a term of 151

11   months.  It is a downward variance as it relates to the

12   offense level from offense level II to offense level I, for

13   the reasons I've already stated.

14          When the defendant is released from prison, he'll be

15   placed on supervised release for a term of 20 years.  And

16   within 72 hours of release from custody of the Bureau of

17   Prisons, he'll be required to report to his probation

18   officer in the district to which he is released.  There will

19   be no fine.  Special assessment of $100 shall be due

20   immediately.  Restitution is sought.  It's not likely he'll

21   be able to pay restitution.

22          And while the defendant's on supervised release, he

23   will not commit another federal, state, or local crime.  He

24   cannot illegally possess a controlled substance, will comply

25   with the standard conditions adopted by this Court, and

1    comply with the following additional conditions:

2         Mandatory drug testing will be in place.  The

3    defendant has issues with alcohol as he's acknowledged.

4         The defendant will refrain from the unlawful use of a

5    controlled substance, submit to one drug test within 15 days

6    of commencement, and at least two periodic drug tests

7    thereafter.  He will be restricted from the use of alcohol,

8    and he obviously has alcohol issues by his own admission,

9    and the argument is that that drinking has in some way led

10   to this behavior, so we will impose the alcohol restriction

11   as well.

12        The defendant will abide by all the rules of the minor

13   protection and restriction program of the U.S. pretrial

14   services and probation office.

15        He'll submit to a mental health evaluation and

16   offender assessment as directed by the pretrial services and

17   probation office and will participate in any treatment

18   program, including treatment for sexual deviancy, which may

19   include polygraph testing.  If recommended by these

20   evaluations, the defendant will submit to periodic drug

21   testing -- or polygraph testing, excuse me, as directed by

22   his pretrial officer, probation officer.

23        No violation proceeding will be based solely on the

24   results of the polygraph exam or a valid Fifth Amendment

25   refusal to answer a polygraph question.

1          The defendant will not own or possess any type of

2     camera, photographic device and/or equipment, including

3     video recording equipment, without the written approval of

4     his probation officer.

5          He cannot possess a firearm, destructive device.

6          I have already touched on the defendant's use of

7     alcohol and/or drugs, as the case may be, although it

8     appears alcohol is his drug of choice.

9          He'll be required to participate in any treatment

10    program, inpatient or outpatient, recommended by the

11    probation officer, and will not tamper in any fashion with

12    any testing that would be put in place.

13         He'll undergo a mental health evaluation, participate

14    in mental health treatment, and that is a strong

15    recommendation from the Court for both the BOP which we'll

16    touch on in a moment and is part and parcel of his term on

17    supervised release.

18         He'll cooperate in the collection of DNA, and he'll be

19    required to abide by the provisions of the Adam Walsh Act,

20    so-called Adam Walsh Act, regarding the sex offender

21    registration and notification.

22         The defendant will be required to register under the

23    Sex Offender Registration Notification Act and comply with

24    all the requirements of that act as directed by his

25    probation officer, keep his registration current in whatever

1    jurisdiction he resides or is employed or is a student, and

2    he must no later than three business days after each change

3    in name, residence, employment, or student status appear in

4    person in at least one jurisdiction in which he's registered

5    and inform that jurisdiction of any changes in federal

6    reporting.

7         And sir, it's important that you -- again, your

8    counsel will remind you as will your, I believe your

9    probation officer ultimately.  You must comply with this

10   condition.  If you do not, it may be a new federal offense

11   punishable by up to ten years.

12        The computer restriction, Internet restriction will be

13   employed, the standard restriction.  He will be prohibited

14   from accessing any online computer at any location including

15   employment or education without prior written approval of

16   the U.S. pretrial services and probation office or the

17   Court.

18        And that will include any Internet service provider

19   bulletin board system, any other public or private networks,

20   and any approval shall be subject to conditions by the

21   probation officer.  And that will include periodic

22   examinations of the computer.  The defendant must consent to

23   it.  That may include retrieval of any and all -- and

24   copying of all memory, hardware, software, removal of such

25   systems.

1          And the defendant will consent to having installed on

2     his computer the appropriate monitoring software and

3     periodic inspection of such software to ensure it is

4     functioning properly.

5          And the defendant will of course provide all the

6     accurate information about his entire system, all passwords,

7     his Internet service provider, abide by all the rules of our

8     computer restriction and monitoring program.

9          The defendant will likewise submit his person,

10    residence, place of business, computer and/or vehicle to a

11    warrantless search conducted and controlled by his probation

12    officer at a reasonable time and in a reasonable manner

13    based upon reasonable suspicion of contraband or evidence of

14    a violation of a condition of release.

15         Failure to submit to that search may be grounds for

16    revocation.  And the defendant shall inform any of the

17    residents that his premises and his computer may be subject

18    to a search pursuant to that condition.

19         We will recommend Elkton for the defendant as counsel

20    requests.

21         We will recommend participation in sex offender

22    treatment at the BOP.  And that hopefully will be something

23    that he will qualify for, I would hope, in the near future,

24    although that treatment is generally, I believe, at the last

25    36 months or so of any sentence.

1       But hopefully the BOP will change that policy.

2       Under *U.S. versus Bostic*, any objections, corrections,

3   any arguments that have not been previously raised that I

4   can address before we adjourn the sentencing hearing?

5       Counsel?

6           MR. SULLIVAN:  Not on behalf of the government.

7   Thank you.

8           THE COURT:  Counsel.

9           MR. WEINTRAUB:  No, Your Honor.

10          THE COURT:  Mr. Schuuring, you have a right to

11  appeal from the Court's sentence if you wish.  You can

12  discuss that matter with your counsel.  If you wish an

13  appeal to be filed, he'll advise you further, but I'll give

14  you the general issues or matters that you should be aware

15  of.

16      I'll issue a written order setting forth your

17  sentence.  And the notice of appeal must be filed no later

18  than 14 days after that sentencing order goes up.  And as

19  you're indigent, we would appoint an attorney.  If Mr.

20  Weintraub wishes the appeal, we would appoint him for the

21  appeal, provide him the necessary papers, transcripts,

22  things of that nature to assist in that appeal?

23      Do you understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Counsel, you can discuss it with him

1    and let me know.  And we will formally appoint you for the

2    appeal if you would like and, you know, moving that forward

3    as we can.

4         Anything else on behalf of the government, please?

5              MR. SULLIVAN:  Yes, Judge.  We ask that Count 2

6    be dismissed.

7              THE COURT:  Count 2 will be dismissed at the

8    request of the government.

9         And we will make the recommendations to the BOP as

10   part of our order, and hopefully that recommendation will be

11   followed.  Obviously we will grant the defendant credit for

12   time served in this particular instance and make them aware

13   of his medical issues so that they can be addressed in the

14   BOP as well.

15        All right.  Thank you very much.  That's how we will

16   proceed.

17             (Proceedings concluded at 11:30 a.m.)

18

19                    C E R T I F I C A T E

20

21        I certify that the forgoing is a correct transcript

22   from the record of proceedings in the above-entitled matter.

23

24             S/Caroline Mahnke                12/21/15

25             Caroline Mahnke, RMR, CRR             Date